SCOTT, A MAN OF COLOR, vs. EMERSON.

1. The voluntary removal of a slave, by his master, to a State, Territory or County in which slavery is prohibited, with a view to a residence there, does not entitle the slave to sue for his freedom, in the courts of this State.

Scott, (a man of color,) vs. Emerson.

## ERROR to St. Louis Circuit Court.

NORRIS, for plaintiff in error.

The point made in the appellant's instruction, which was not given by the court below, will first be considered: That if Dr. Emerson (who was the owner of the slaves Dred and Harriet, and who was also a Surgeon in the United States army) owned said slaves, previous to his reception of the order, and took said slaves with him as domestic servants, and they remained at those posts, Rock Island and Fort Snelling, until they voluntarily returned to St. Louis, in a slave State, they are now not free but slaves. We propose to give a slight review of the cases, that have been decided in our own court, upon the direct and collateral questions involved in this case.

1. The first case, adjudicated in our courts, is the case of Winny vs. Whitesides, 1 Mo. 331. There is not a single authority quoted in the opinion of Mr. Justice Tompkins, who, we shall discover in the examination of later cases, was the great apostle of freedom at that day. Indeed, it is fair to presume, from such sentences as "they found the citizens claiming a right of property in a miserable portion of the human race," and "that the evil should be restricted as much as possible;" that he was deeply tinged with sentiments and opinions dangerous to the existence of that "peculiar institution," known as domestic slavery.

The question here decided is, that the slave was entitled to his freedom by virtue of the ordinance of 1787, from a residence in the Territory of Illinois, and that the rights of the master would not re-attach on finding his slave in Missouri.

2. Mary vs. Tiffin & Menard, 1 Mo. Rep.521, Cons. on Ord. of 1787. The child of a slave, born in Illinois after the ordinance took effect, is free.

3. La Grange vs. Chouteau, 2 Mo. Rep. 19, opinion of Mr. Justice Wash. Ord. of 1787. Eight or nine days residence in Illinois not sufficient to entitle a slave to freedom, under the ordinance.

4. Mitty vs. Smith, 2 Mo. Rep. 32, residence in Illinois. Mr. Justice Tompkins decided this case upon the authority of the previous judicial construction of the ordinance of 1787, and although the facts in the case are subsequent to the passage of the Mo. Comp. act of 1820, that law was in no way discussed or considered.

5. Theotiste vs. Chouteau, 2 Mo. 116, Mr. Justice Tompkins. A slave born in 1782 in Illinois, was not enfranchised by the ordinance of 1787; the right to hold such slave being a vested right under the Virginia cession, the ordinance was not retroactive in its operation.

6. Milly vs. Smith, 2 Mo. Rep. 139, Justice McGirk. "This was an action on the part of Mitty for freedom, under the ordinance of 1787"

7. Vincent vs. Duncan, 2 Mo. Rep. 174. The constitution of the State of Illinois, ratified by Congress 3d December, 1818, provides, that slaves may be hired out, from year to year, to labor at the salines without thereby working their freedom. The ordinance of 1787 cannot control the provisions of this State's constitution (see Strader vs. Graham, 10 Howard 82.) Nor can a slave, by himself acquire either on permanent settlement, or regular domicil, ye', "Ergo," says Mr. Justice Tompkins, "if he, the owner of the slave, stay in Kentucky and send his servant over to Illinois to reside, it is equally (with residing there himself) a violation of the provision of the ordinance, and the slave is free."

We confess our inability to perceive, either the reason, the law or the consistency of the dicta contained in the above decision, as logical deductions from the premises laid down.

8. Ralph vs. Duncan, 3 Mo. 138 (Tompkins) Ord. of 1787. We have no doubt, that for the purposes of self government, the constitution of Illinois might have been well in force from the time of its adoption, but, for the purpose of the present case, we incline to limit its effect to the time when Congress assented to the admission of the State into the Union, 3d December, 1818.

Scott, (a man of color,) vs. Emerson.

9. Julia vs. McKinney, 3 Mo. 193, McGirk, Justice. Interpretation of the constitution of Illinois. Plaintiff's claim for freedom in this case, from the 6th article of the constitution of Illinois, which declares, that neither slavery nor involuntary servitude shall hereafter be introduced into this State, otherwise than for the punishment of crimes whereof the party shall have been duly convicted. The article then goes on to make provision for the hiring of slaves from another State, to wit: "That no person bound to labor in any other State shall be hired to labor in this State, except within the tract reserved for the salt works," and further recites, that any violation of this article shall effect the emancipation of such persons from their obligation to service. Plaintiff's mistress, emigrating from Kentucky, took the plaintiff, Julia, then a slave, with her, and hiring her out for about a month, subsequently sold her in St. Louis to defendant. Held, that the above article of the constitution worked her freedom.

10. Natt vs. Rudelle, 3 Mo. Rep. 282, Mr. Justice Tompkins here settles an instruction, as to the consent of the master to the residence of the slave in a free State, being necessary to work his freedom.

—11. Rachael vs. Walker, 4 Mo. Rep. 351 ordinances of 1787, is a case that is more clearly analagous to the one now under consideration, than any that has yet been cited. The respondent was an officer, residing in the then Michigan Territory: a slave was bought in St. Louis and sent to him, and notwithstanding the point made by Hamilton R. Gamble, Esq., "that an officer of the U. S. Army was such a person as could not acquire such a domicil in any other than the State of which he is an inhabitant, when appointed, as is necessary under the former decision of this court to work the freedom of the slave. Mr. Justice McGirk held, that by operation of the ordinance and the previous decisions of the court, Rachael was free, and that the fact of his being an officer, could not create an exception in his favor. This case and the present one, that we are now discussing, are identical, with this exception, that in the former, temporarily staying in a territory claimed to be free, sent to a slave State and purchased a servant, and she was sent to him. In the latter, Dr. Emerson owned the slave Dred, and was, at the time, living where, by the law and the constitution, slavery was recognized before he received the order to go into any other territory. Still, we are free to admit, that this distinction is of no avail, if the opinion of Mr. Justice McGirk is considered good law. It covers the entire ground, as to the plea of domicil and necessity, and we are inclined to think, that Mr. Justice McGirk, in his anxiety to settle the question, which, he says, the "ingenuity of counsel never would concede," has journeyed out of the record, in his zeal to support the authority of the decisions of this court.

12. Wilson vs. Melvin, 4 Mo. Rep. 592—seems to have been the closing effort, by counsel, to protect the rights of owners of slave property, and from the opinion of Mr. Justice Tompkins, it might well be concluded, that any further argument was useless. The defendant moved from Tennessee to the west, whether to Illinois or Missouri does not clearly appear, and while traveling through Illinois, was informed, that he could not hold slaves in that State. He accordingly took every precaution to prevent the forfeiture of his property; he staid some two or three weeks, visiting his children in St. Clair county, refused to unload his wagons containing his family goods, refused to hire servants or to allow them to do any labor. When he had finished his visit he concluded his journey and hired out his servants in St. Louis. The court held, that this was introducing slavery in Illinois, and that the constitution of Illinois was obligatory upon the courts in Missouri, and which, by its provisions, has worked the freedom of Wilson, the appellant. Nothing is said in the argument of counsel or the opinion of the court, of the ordinance of 1787 or the Missouri compromise act of 1820. On the contrary, it appears, that the counsel relied solely upon the violation of the constitution of Illinois, consequent upon the introduction of slavery within its borders. This case was decided at the June Term 1837. The question of freedom, as a consequence of residence in free territory, was not again mooted until the January Term of this court 1845. When the court seems to have come back to the consideration of Missouri law, leaving the enforcement of other State constitutions with their penal laws, to their own tribunals, where they should ever be allowed to remain.

Scott, (a man of color,) vs. Emerson.

13. Chouteau vs. Pierre, 9 Mo. Rep. 3, Justice Scott. The questions here decided, applicable to the case under consideration, are, that the ordinance of 1787 had no force in any post or precinct of the N. W. Territory in possession of Great Britain, prior to 1796, and that a slave, held prior to that time within such post, acquired no right to his freedom by virtue of such ordinance.

14. Charlotte vs. Chouteau, 11 Mo. Rep. 194, endorses the decision in the case just quoted, and adds thereto, that "whatever may be the policy of other governments, it has not been the policy of this State, to favor the liberation of negroes from that condition, in which the laws and usages have placed the mass of their species.

These are all the decisions that have been made in our own court, upon the questions, direct and collateral, involved in this cause.

In none of these cases do we find, after careful examination, that the authority of the ordinance of 1787 was questioned. It was taken for granted, by the court and counsel, that it was yet, in full force and vigor, the law of the land. Nor was the voluntary return of the slaves to their *status* of slavery (with but one exception) considered as in any way effecting the rights which it was supposed they had acquired by the operation of that ordinance, or the local and foreign laws of neighboring and free States. The dictum, "once a free man, always a free man," though founded about as deeply in law, history and reason as, that "all men are born free and equal," was received with equally blind faith, and these two points, which presented, in fact, the principle issues, were considered (if at all) as unimportant and ineffectual to protect the rights of citizens of slave States.

The main questions then, which are decisive of this action, we enter upon, unentrammelled by local law and local decisions.

We contend,

1. The ordinance of 1787 was, upon the adoption of the constitution of the United States, *functus officio.*

2. That the Missouri compromise act, so far as it relates to freedom or slavery, is local, having solidity only north of the line of 36 deg 30 min. Was a compromise acquiesced in by the people of Missouri, under protest and so far as it endeavors or intends to interfere with the laws of slavery in the southern States, may be and ought to be disregarded, and that before this court should recognize any of the rights of freedom claimed under it, those rights should first be enforced and perfected by the tribunals of that comity north of the line of 36 deg 30 min., and even then the comity that calls upon them so to act has no remarkable sanction.

3. This court ought not. either in comity, equity or reason, to consider, interpret or enforce foreign constitutions and laws, which, penal in their nature, work the forfeiture of the property of our citizens.

4. That Dr. Emerson, the respondent, did not violate the compromise act of 1820, by obeying the directions of his government, ordering him to Rock Island and Fort Snelling, and taking with him his property, recognized as such by the constitution of the United States.

5. That the voluntary return of the slave Dred, to the *status* of slavery, places him under the operation of our local laws, and the rights of his master (if ever divested) re-attach the moment they are again in a State that recognizes the peculiar institution of domestic slavery.

We deem it unnecessary to argue the first point, made as it has been already, considered and decided by the highest tribunal known to our government, whose especial province it is to interpret and enforce the laws of Congress. That tribunal in the recent case of Strader vs. Graham, 11 How 82, held as follows, (referring also to the cases of Pollard vs. Hogan, 3 How 212; Permoli vs. First Municipality, 3 How 589, (they say in concluding:) "As we have already said it' (the ord. of 1787) "ceased to be in force upon the adoption of the constitution, and cannot now be the source of jurisdiction of description in this court."

Neither the force of reasoning, when examined, nor the authority of the case will, we imagine, be questioned, and we pass to the second point:

Scott (a man of color) vs. Emerson.

The authority and effect of the Missouri compromise act of 1820.

We deem it necessary briefly to recur to the history of that act, although to your Honors who have aided in making the history of our State, who can truthfully as well as poetically say "*magna pars quorum fuimus*, it may seem like a twice told tale, not I hope vexing the ear of a drowsy man.

By treaty, concluded 30 April 1803, the United States acquired the title to Louisiana; Oct. 31st of same year, the President was authorized to take possession. By act of Congress of same date Louisiana was organized as two Territories. North of the 33 deg. parrallel was the District of Louisiana, South was the Territory of Orleans. The District of Louisiana, changed by act of Congress to Territory of Louisiana, and later to the Territory of Missouri was by the act of 4th of June 1812, finally settled in its government, and duly established on the usual territorial basis.. Rapidly increasing in wealth, population and power, Missouri claimed admission into the Union on an equality with her sister States. Then commenced the agitation, the history, objects and effects of which your Honors are as familiar with as with household words. If the historians and writers of the day are to be believed, it was deep seated and wide spread excitement, that for a long time threatened the existence of the Union and the perpetuity of free institutions. It was the periodical appearance of an epidemical disease, a species of "Black Vomit" that ever has and will, we hope, continue to carry unfledged statesmen and "higher law" demagogues to the grave of political oblivion. Wi h an earnest desire to calm the storm that had been awakened, Missouri, under protest accepted the compromise act of the great statesman who originated it, and neither waiving her just views of the constitutional power of Congress to impose the condition, nor to recognize the right of any created being to control or weaken in any manner her State rights, she came into the Union.

In passing whatever may be our views of the expediency of compromise in questions of legal or moral right, we cannot refrain from paying an humble tribute to the patriotism,. sincerity, eloquence and honesty of purpose of the statesman who, as the father of the compromise adjustments, has so often ruled the whirlwind of popular fury. Then his star had just appeared in the east—it has approached and passed the zenith of its power, and now is slowly sinking in the western horizon. "We discern no paling of its intellectual fires"—it shines with an effulgence, not dazzling and brilliant as in its meridian splendor, but like the mellow light of the harvest-moon—mild, fructifying, peaceful. It will soon pass away forever, and may there be both f. iend and foe, who will unite in sorrow over the tomb of Henry Clay in wishing

"Peace to the just man's memory,
Let it grow green in the lapse of time,
And blossom through the flight of ages."

The best interpretation of the intent of Congress in creating a law, is found in the preamble and style of the act itself, which, when the sense is obscure often throws light which the text does not give. The act of 1820 was an "act to authorize the people of the Missouri Territory to form a constitution and State government, and for the admission of such State into the Union on an equal footing with the original States, and to prohibit slavery in certain territories." After making provision for boundaries, a convention, election, &c., &c , it goes on to enact in sec. 8, "That in all that territory ceded by France to the United States under the name of Louisiana, which lies north of thirty-six degrees and thirty minutes north latitude, not included within the limits of the State contemplated by this act, slavery and involuntary servitude, otherwise than in punishment of crimes, whereof the parties shall have been duly convicted, shall be, and is hereby forever prohibited: Provided always, that any person escaping into the same from whom labor or service is lawfully claimed, in any State or territory of the United States, such fugitives may be lawfully reclaimed and conveyed to the person claiming his or her labor or service aforesaid."

Admitting for the sake of argument, that the Congress had the constitutional power to

enact this section of the law, we maintain that it is entirely local in this provision, and by express reservation Missouri is exempted from the operation. "Shall be and the same is hereby forever prohibited." Where? Not in Missouri. What? Involuntary servitude. How to be determined? By every court in every State, or by those courts that are created in the free territory thus made.

Suppose Congress should pass a law declaring that the keeping of black horses, a species of property existing in Missouri and recognized by the constitution of the United States and of Missouri "shall be and the same is hereby prohibited in the territory of Utah." The same government that passes the law through the executive department, orders an officer, who unfortunately owns a black horse, that he can neither sell, loose nor give away, to the territory of Utah, and he takes with him his said horse (I admit that the horse, if there were horse abolitionists there, would get his freedom in Utah;) but when he comes back here and asks you to give him up, would you do it? This is perhaps a strong andcoarse illustration, but is it not a case in point

That laws of Congress are binding upon us because we helped to make them, and because they are the laws of the land, obligatory upon all the people, is admitted with a saving. Justice Tompkins thought, that the constitution of Illinois worked the freedom of a slave in our courts, and why would not the fundamental law of France. England and St. Domingo, not more foreign to us than some of the northern States, on the subject of slavery. Laws of Congress punish mail robbery, counterfeiting the United States coin, breach of the revenue laws, and yet they are not claims punishable by our local laws. Our courts will not enforce them but leave them to the United States tribunals.

We are acting in the capacity of State courts, mostly concerned with local laws and sectional matters and have no tribunal to judge fully and finally of the extent and force of their obligation. The same power that made these U. S. laws, constituted courts to interpret and enforce them. Hence it is that when we do consider and interpret United States law, she claims the right to examine our decision and pronounce upon its correctness. Take this particular law. It has nothing to operate on in Missouri—no force here. It referred at the time of its enactment to the territory of Missouri; outside of, and beyond the limits of this State's jurisdiction. In United States territory, governed exclusively by United States laws, interpreted by United States tribunals, it was a court, the sole exclusive jurisdiction of which resided in Congress, representing the sovereignty of the people. They made its laws and moulded its government. Let them enforce its edicts.

In support of the fifth point—That the voluntary return of the slave Dred, to the status of slavery, places him under the operation of our local laws, and the rights of his master (if ever divested) re-attach the moment they are again in a slave State, that recognizes the peculiar institution of domestic slavery, the court is referred to the following authorities: Slave, Grace, 2 Hay. Adm. Rep.; Strader vs. Graham, 10 Howard 82, Ibid. 7 Ben Monroe 635; Com vs. Ames, 18 Pick. 193; Strader vs. Graham, 5 Ben Monroe 1812-3; Story's Conf. Laws, section 93.

Adding thereto the words of wisdom contained in the opinion of Chf. Jus. Napton, in Charlotte vs. Choteau 11 Mo. Rep. 200: "Neither sound policy nor enlightened philanthropy should encourage in a slaveholding State, the multiplication of a race, whose condition could be neither that of freemen nor slaves, and whose existence and increase in this anomalous character, without promoting their individual comfort or happiness, tends only to dissatisfy and corrupt those of their own race and color remaining in a state of servitude."

## D. B. HILL, for respondent.

1st. The court rightly instructed the jury, that the taking and holding the appellee, as a slave at Rock Island and Fort Snelling, entitled him to his freedom. The fact that they were military posts, does not affect his rights.

Scott, (a man of color) vs. Emerson.

2nd. Even if he could not acquire a right to his freedom in consequence the right of the deceased Dr. Emerson to employ and have servants for his own use there, he would acquire such freedom by being left by the deceased in the service of others as a slave, after he himself was removed, by orders to a different post. Julia vs. McKinny, 3 Mo. Rep. 193; Wilson vs. Melvin, 4 Mo. Rep. 592; Nat vs. Ruddle, 3 Mo. 282; Ralph vs. Duncan, 3 Mo. Rep. 139

3d. The ordinance of 1787 is a valid and binding law. It has often been recognized by this court: Winny vs. Whiteside, 1 Mo. 334; Mary vs. Tippin et al. 1 Mo. 520; Lagrange vs. Choteau, 2 Mo. 19; Theoteste vs. Choteau, 2 Mo. 116; Vincent vs. Duncan, 2 Mo. 174; Ralph vs. Duncan 3 Mo. 139.

Scott, J., delivered the opinion of the court.

This was an action instituted by Dred Scott against Irone Emerson, the wife and administratrix of Dr. John Emerson, to try his right to freedom. His claim is based upon the fact that his late master held him in servitude in the State of Illinois, and also in that territory ceded by France to the United States, under the name of Louisiana, which lies north of 36 degrees 30 minutes, north latitude, not included within the limits of the State of Missouri.

It appears that his late master was a surgeon in the army of the United States, and during his continuance in the service, was stationed at Rock Island, a military post in the State of Illinois, and at Fort Snelling, also a military post in the territory of the United States, above described, at both of which places Scott was detained in servitude—at one place, from the year 1834, until April or May, 1836; at the other from the period last mentioned, until the year 1838. The jury was instructed, in effect, that if such were the facts, they would find for Scott. He, accordingly, obtained a verdict.

The defendant moved for a new trial on the ground of misdirection by the court, which being denied to her, she sued out this writ of error.

Cases of this kind are not strangers in our courts. Persons have been frequently here adjudged to be entitled to their freedom, on the ground that their masters held them in slavery in territories or States in which that institution was prohibited. From the first case decided in our courts, it might be inferred that this result was brought about by a presumed assent of the master, from the fact of, having voluntarily taken his slave to a place where the relation of master and slave did not exist. But subsequent cases base the right "to exact the forfeiture of emancipation," as they term it, on the ground, it would seem, that it is the duty of the courts of this State to carry into effect the constitution and laws of other States and territories, regardless of the rights, the policy or the institutions of the people of this State.

Scott, (a man of color) vs. Emerson.

The States of this Union, although associated for some purposes of government, yet, in relation to their municipal concerns have always been regarded as foreign to each other. The law of descents of one State is not regarded in another, in the distribution of the estates of deceased persons. So of the law of wills, administrations, judicial proceedings, and all other matters of mere internal police. The courts of one State do not take judicial notice of the laws of other States. They, when it is necessary to be shown what they are, must be proved like other facts. So of the laws of the United States, enacted for the mere purpose of governing a territory. These laws have no force in the States of the Union, they are local, and relate to the municipal affairs of the territory. Their effect is confined within its limits, and beyond those limits they have no more effect, in any State, than the municipal laws of one State would have in any other State: State of Virginia acts; Cohen's 6 Wheat. This doctrine is declared and maintained, not only with respect to nations strictly foreign to each other, but also to the several States of this Union. Every State has the right of determining how far, in a spirit of comity, it will respect the laws of other States. Those laws have no intrinsic right to be enforced beyond the limits of the State for which they were enacted. The respect allowed them will depend altogether on their conformity to the policy of our institutions. No State is bound to carry into effect enactments conceived in a spirit hostile to that which pervades her own laws. In the Conflict of Laws, sec. 36, it is said: "but of the nature, and, extent and utility of this recognition of foreign laws, respecting the state and condition of persons, every nation must judge for itself, and certainly, is not bound to recognize them, when they would be prejudicial to their own interests. It is, in the strictest sense a matter of the comity of nations, and not of any absolute paramount obligation, superseding all discretion on the subject." So in sec. 32, it is said, "it is difficult to conceive, upon what ground a claim can be vested, to give any municipal laws an extra territorial effect, when those laws are prejudicial to the rights of other nations or to those of their subjects; it would at once annihilate the sovereignty and equality of every nation, which should be called upon to recognize and enforce them, or compel it to desert its own proper interests and duty to its own subjects in favor of strangers, who were regardless of both. A claim so naked of any principle or just authority to support it, is wholly inadmissible."

Again, "the comity of nations is derived altogether from the voluntary consent of the state by which it is shown, and is inadmissible, when it is contrary to its known policy or prejudicial to its interests.

In the silence of the positive rule, affirming or denying or restraining the operation of foreign laws, courts of justice presume the tacit adoption of them by their own government, unless they are repugnant to its policy or prejudicial to its interest." sec. 38. It is a humiliating spectacle, to see the courts of a State confiscating the property of her own citizens by the command of a foreign law. If Scott is freed, by what means will it be effected, but by the constitution of the State of Illinois, or the territorial laws of the United States? Now, what principle requires the interference of this court? Are not those governments capable of enforcing their own laws; and if they are not, are we concerned that such laws should be enforced, and that, too, at the cost of our own citizens?—States, in which an absolute prohibition of slavery prevails, maintain that if a slave, with the consent of his master, touch their soil he thereby becomes free. The prohibition in the act, commonly called the Missouri Compromise, is absolute. How is that to be interpreted That act prevails along our entire western boundary; if our courts take upon themselves the task of enforcing the laws of other States, it is nothing but reasonable that they should take them as they are understood where they are promulgated. If a slave passes our western boundary, by the order of his master, and goes into the territory subject to the Missouri Compromise, does he thereby become free? Most of the courts of this Union would say that he does, if his freedom is sought to be recovered under the laws of that territory. If our courts undertake the task of enforcing that act, should they not take it as most of the other States would? Some of our old cases say, that a hiring for two days would be a violation of the constitution of Illinois and entitle the slave to his freedom. If two days would do, why not one? Is there any difference in principle or morality between holding a slave in a free territory two days more than one day? and if one day, why not six hours? The old cases say, the intent is nothing, the act is the thing.

Now are we prepared to say, that we shall suffer these laws to be enforced in our courts? On almost three sides the State of Missouri is surrounded by free soil. If one of our slaves touch that soil with his master's assent, he becomes entitled to his freedom. Considering the numberless instances in which those living along an extreme frontier would have occasion to occupy their slaves beyond our boundary, how hard would it be if our courts should liberate all the slaves who should thus be employed. How unreasonable to ask it. If a master sends his slave to hunt his horses or cattle beyond the boundary, shall he thereby be liberated? But our courts, it is said, will not go so far. If not go the entire length, why go at all? The obligation to enforce to the proper

degree, is as obligatory as to enforce to any degree. Slavery is introduced by a continuance in the territory for six hours as well as for twelve months, and so far as our laws are concerned, the offence is as great in the one case as in the other. Laws operate only within the territory of the State for which they are made, and by enforcing them here, we, contrary to all principle, give them an extra territorial effect. Chancellor Kent says: "A statute, though not in the nature of a judicial proceeding, is, however, a record of the highest nature. But if a statute, though a matter of record, was to have the same effect in one State as in another, then one State would be dictating laws for another, and a fearful collision of jurisdiction would instantly follow. That construction is utterly inadmissible, while it is conceded to be a principle of public law, requisite for the safe intercourse and commerce of mankind, that acts, valid by the law of the State where they arise, are valid everywhere, it is at the same time, to be understood, that this principle relates only to civil acts founded on the volition of the parties, and not to such as proceed from the sovereign power. The force of the latter cannot be permitted to operate beyond the limits of the territory, without affecting the necessary independence of nations." 2 Kent, 117, 8.

This language is used when speaking in reference to the legislation of other States of the Union. It is conceived, that there is no ground to presume or to impute any volition to Dr. Emerson, that his slave should have his freedom. He was ordered by superior authority to the posts where his slave was detained in servitude, and in obedience to that authority, he repaired to them with his servant, as he very naturally supposed he had a right to do. To construe this into an assent to his slave's freedom would be doing violence to his acts. Nothing but a persuasion, that it is a duty to enforce the foreign law as though it was one of our own, could ever induce a court to put such a construction on his conduct. The present atitude of the parties to this suit is conclusive, as to an actual consent, and nothing but the foreign law or the aid derived from it, can raise an implied one. If the State of Missouri had prohibited slavery within her limits, and our courts were called upon to execute that law, some zeal might be tolerated in our efforts to execute it; but while slavery obtains here, there is no consideration which would warrant us in going such lengths against our own citizens, for having permitted their slaves to remain in the territory of a State where slavery is prohibited.

In States and Kingdoms in which slavery is the least countenanced, and where there is a constant struggle against its existence, it is admitted law, that if a slave accompanies his master to a country in which

slavery is prohibited, and remains there a length of time, if during his continuance in such country there is no act of manumission decreed by its courts, and he afterwards returns to his master's domicil, where slavery prevails, he has no right to maintain a suit founded upon a claim of permanent freedom. This is the law of England, where it is said that her air is too pure for a slave to breathe in, and that no sooner does he touch her soil than his shackles fall from him. The case of slave, Grace, 2 Haggard Adm'rl'ty Rep. 94. Story, in his conflict of laws, says, "it has been solemnly decided that the law of England abhors and will not endure the existence of slavery within the nation, and consequently, so soon as a slave lands in England, he becomes ipso facto, a free man, and discharged from the state of servitude; and there is no doubt that the same principle pervades the common law of the non-slaveholding States in America: that is to say, foreign slaves would no longer be deemed such after their removal thither." But he continues, "it is a very different question how far the original state of slavery might re-attach upon the party, if he should return to the country by whose laws he was declared to be and was held as a slave:" Sec. 95, 6. In the case of the commonwealth of Massachusetts vs. Ames, 18, Peck, Judge Shaw, although declining to give an express opinion upon this question, intimates very clearly that if the slave returns to his former country where slavery obtains, his condition would not be changed. In the case of Graham vs. Strader, 5 Mon. 183, the court of Appeals in Kentucky held, that the owner of a slave, who resides in Kentucky, and who permits his slave to go to Ohio in charge of an agent for a temporary purpose, does not forfeit his right of property in such slave.

An attempt has been made to show, that the comity extended to the laws of other States, is a matter of discretion, to be determined by the courts of that State in which the laws are proposed to be enforced. If it is a matter of discretion, that discretion must be controlled by circumstances. Times now are not as they were when the former decisions on this subject were made. Since then not only individuals but States have been possessed with a dark and fell spirit in relation to slavery, whose gratification is sought in the pursuit of measures, whose inevitable consequence must be the overthrow and destruction of our government. Under such circumstances it does not behoove the State of Missouri to show the least countenance to any measure which might gratify this spirit. She is willing to assume her full responsibility for the existence of slavery within her limits, nor does she seek to share or divide it with others. Although we may, for our own sakes, regret that the avarice and hard-heartedness of the progenitors of those who are

now so sensitive on the subject, ever introduced the institution among us, yet we will not go to them to learn law, morality or religion on the subject.

As to the consequences of slavery, they are much more hurtful to the master than the slave. There is no comparison between the slave in the United States and the cruel, uncivilized negro in Africa. When the condition of our slaves is contrasted with the state of their miserable race in Africa; when their civilization, intelligence and instruction in religious truths are considered, and the means now employed to restore them to the country from which they have been torn, bearing with them the blessings of civilized life, we are almost persuaded, that the introduction of slavery amongst us was, in the providences of God, who makes the evil passions of men subservient to his own glory; a means of placing that unhappy race within the pale of civilized nations.

Judge Ryland concurring, the judgment will be reversed, and the cause remanded.

GAMBLE, J., dissenting opinion.

As I am constrained to depart from the opinion given by a majority of the court, the questions involved in the case and the present condition of feeling in the country, seem to require that I should state the grounds of the dissent.

In all ages, and in all countries in which slavery has existed, the slave has been regarded not merely as property, but also as a being capable of acquiring and holding certain rights, by the act of the master. He could acquire and enforce his right to freedom in modes recognized by the law of the country in which he dwelt.

In the early English law, where there existed a species of slavery, known as villenage, the villain might be emancipated by his lord, either directly by deed, or by implication of law, from some act of the master recognizing him as a freeman, as by making to him an obligation for a sum of money, or conveying lands to him, or by impleading him in an action. This appears, as well by the text of Littleton as by the commentary of Lord Coke, 1 Just. 137 A. & B. By the Spanish law, 1 Partictus 587, the mode in which a master may emancipate his slave is prescribed; and at page 589 certain meritorious actions are mentioned, which, when performed by a slave, authorize his emancipation even against the will of his master. In Justinian's Institutes, Liber 1 Lit. 5 Sec. 1, it is declared, that "manumission is effected in various ways, either in the face of the church, according to the imperial constitutions,

or in the presence of friends, or by letter, or by testament, or by any other last will.   Liberty may also be conferred upon a slave by divers other methods, some of which were introduced by former laws, and others by our own."

In every slaveholding State in the Union, the subject of emancipation is regulated by statute, and the forms are prescibed in which it shall be effected.   Whenever the forms, required by the laws of the State in which the master and slave are resident, are complied with, the emancipation is complete and the slave is free.   If the right of the person thus emancipated, is subsequently drawn in question in another State, it will be ascertained and determined by the law of the State in which he and his former master resided; and when it appears, that such law has been complied with, the right to freedom will be fully sustained in the courts of all the slave holding States, although the act of emancipation may not be in the form required by the laws of the State in which the court is sitting.   Take, for example, an emancipation by will.   If a master, residing and holding slaves in Missouri, should emancipate them by will, executed and proved, according to our laws, and the slaves thus emancipated, should, in the exercise of their freedom acknowledged and enjoyed here, emigrate to another slave State, where emancipation by will was not permitted, there is no person so ignorant as to suppose that they would lose their right to freedom by such change of residence.   Decision of courts might be cited on this point, but it is not necessary to appeal to the tribunals for the maintainance of a principle so perfectly plain.

In all such cases, courts continually administer the law of the country where the right was acquired; and when that law becomes known to the court, it is just as much a matter of course, to decide the rights of the parties according to its requirements, as it is to settle the title of real estate, situate in our State, according to our own laws.

We, here, are the citizens of one nation, composed of many different States which are all equal, and are each and all entitled to manage their own domestic interests and institutions, by their own municipal law, except so far as the constitution of the United States interferes with that power.   The perfect equality of the different States, lies at the foundation of the Union.   As the institutions of slavery in the States, is one over which the constitution of the United States gives no power to the general government, it is left to be adopted or rejected by the several States, as they think best.   Nor can any one State, nor any number of States claim the right to interfere with any other State, upon the question of admitting or excluding this institution.   It must be borne

in mind, that this freedom and equality of the different States, supposes that each can, of its own will, according to its own judgment, excludes slavery, with as little cause of offence to any of the other States, as if its decision was in favor of admitting it. As citizens of a slaveholding State, we have no right to complain of our neighbors of Illinois, because they introduce into their State constitution a prohibition of slavery; nor has any citizen of Missouri, who removes with his slave to Illinois, a right to complain that the fundamental law of the State to which he removes, and in which he makes his residence, dissolves the relation between him and his slave. It is as much his own voluntary act, as if he had executed a deed of emancipation. Nor can any man pretend ignorance, that such is the design and effect of the constitutional provision. The decisions which have heretofore been made in this State, and in many other slaveholding States, give effect to this and other similar provisions, on the ground, that the master, by making the free State the residence of his slave, has voluntarily subjected himself and his property to a law, the operation of which he was bound to know. It would seem difficult to make any sound distinction between the effect of an emancipation produced by the act of the master, in thus voluntarily placing his slave under the operation of such a law, and that of an emancipation produced by the act of the master, by the execution of an instrument of writing in any State where the slave resided, which, according to the law of that State, would be sufficient to discharge the slave from servitude, although it might not be a valid emancipation under the laws of another State.

While I merely glance at the reasons which might be urged in support of the present plaintiff's claim to freedom, if it were an original question, I do not propose to rest my dissent from the opinion given in this case, upon the original reasoning in support of the position.

I regard the question as conclusively settled, by repeated adjudications of this court, and if I doubted or denied the propriety of those decisions, I would not feel myself any more at liberty to overturn them than I would any other series of decision, by which the law upon any other question was settled. There is with me, nothing in the law relating to slavery, which distinguishes it from the law on any other subject, or allows any more accommodation to the temporary public excitements which are gathered around it. It is, undoubtedly, a matter to be deeply regretted, that men who have no concern with the institution of slavery, should have claimed the right to interfere with the domestic relations of their neighbors, and have insisted that their ideas of philanthropy and morality should be adopted by people who are certainly capable of

38

deciding upon their own duties and obligations. That the present owners of slaves, when denounced, in terms that would be appropriate, if they had actually kidnapped the slaves from the coast of Africa, or had inherited the fortunes accumulated by such iniquitous traffic, should feel exasperated by such wanton and unfounded attacks, is but natural. That, alienation of feeling and, finally, settled hostility will be produced by this course of conduct, is greatly to be apprehended. But, in the midst of all such excitement, it is proper that the judicial mind, calm and self balanced, should adhere to principles established when there was no feeling to disturb the view of the legal questions upon which the rights of parties depend.

In this State, it has been recognized, from the beginning of the government, as a correct position in law, that a master who takes his slave to reside in a State or Territory where slavery is prohibited, thereby emancipates his slave : Winney vs. Whitesides, 1 Mo. Rep. 473; Le Grange vs. Chouteau, 2 Mo. Rep. 20; Milley vs. Smith, Ibid 36; Ralph vs. Duncan, 3 Mo. Rep. 194; Julia vs. McKinney, Ibid 270; Natt vs. Ruddle Ibid 400; Rachael vs. Walker, 4 Mo. Rep. 350; Wilson vs. Melvin, Ibid 592. These decisions, which come down to the year 1837 seem to have so fully settled the quetion, that since that time there has been no case bringing it before the court for any reconsideration until the present. In the case of Winney vs. Whitesides, the question was made in the argument "whether one nation would execute the penal laws of another," and the court replied in this language: "Huberus, quoted in 4 Dallas 375 says, 'personal rights or disabilities, obtained or communicated by the laws of any particular place, are of a nature which accompany the person wherever he goes. If this be the case in countries altogether independent of each other, how much more in the case of a person removing from this common territory of all the States to one of the States. An adjudication on those rights, in the country where they accrue, may be evidence of them, but cannot give them. We are clearly of opinion, that if by a residence in Illinois, the plaintiff in error lost her right to the property in defendant, that right was not revived by a removal of the parties to Missouri."

The principle thus settled, runs through all the cases subsequently decided, for they were all cases in which the right to freedom was claimed in our courts, under a residence in a free State or territory, and where there had been no adjudication upon the right to freedom in such State or territory.

But the supreme court of Missouri, so far from standing alone on this question, is supported by the decisions of the other slave States, includ-

Scott, (a man of color,) vs. Emerson.

ing those in which it may be supposed there was the least disposition to favor emancipation. In Lunsford vs. Coquellon, 2 Martin U. S. 401, the supreme court of Louisiana held, that the removal of a slave by his master from Kentucky to Ohio, with intention to reside there, *ipso facto* emancipates the slave. The same court, in Marie Louise vs. Marot and others, 9 L. R. 475, and in Smith vs. Smith, 13 L. R. 441 holds "that the fact of a slave being taken by the owners to the kingdom of France or other country, where slavery is not tolerated, operates upon the condition of the slave and produces immediate emancipation." See, also, Thomas vs. Generis, L. R. 483 ; Josephine vs. Poultney, 1 Annual R. 329. The current of judicial authority in that State, was so uniform, that in 1846 an act was passed by the legislature which declared, that residence in a country where slavery is prohibited, shall not entitle the slave to freedom. Upon this statute, the supreme court in Eugene vs. Percival, 2 Annual R. 180 remarks, that it settles the law upon the subject, upon the principles laid down by Lord Stowell, in the case of the slave, Grace, 2 Haggard's Admiralty R. 94.

In Harry and others vs. Decker and Hopkins, Walker 36, the Supreme Court of Mississippi held, that any State may, by its constitution, prohibit slavery within its limits, and so may the legislature, when not restrained by the constitution; and that slaves within the limits of the north-west territory, became free by the ordinance of 1787, and may assert their rights in the courts of Mississippi.

In Griffiith vs. Fanny, Gilmers R. 143, the court of Appeals of Virginia held, that a negro held in servitude in Ohio, was entitled to freedom under the constitution of Ohio.

Judge Mills, in delivering the opinion of the court of Appeals of Kentucky, in Rankin vs. Lydia, 2 A. K. Marsh. 468, maintained the right of a negro to freedom by reason of a residence in Indiana, and considers the question, whether the plaintiff's claim to freedom was of a penal character, because it accrued by the laws of another government, that would not be enforced in Kentucky. The opinion is one of ability, and maintains the right of the negro to assert her claim to freedom in the courts of Kentucky, although there was no actual enjoyment of freedom in Indiana. See, also, Bush's Reps. vs. White and wife, 3 Monroe 104.

The cases here referred to, are cases decided when the public mind was tranquil, and when the tribunals maintained in their decisions, the principles which had always received the approbation of an enlightened public opinion. Times may have changed, public feeling may have changed, but principles have not and do not change; and, in my judg-

ment, there can be no safe basis for judicial decisions, but in those prin-
ciples, which are immutable.

It may be observed, that the principle is either expressly declared or
tacitly admitted in all these cases, that where a right to freedom has
been acquired, under the law of another State or commnnity, it may be
enforced by action, in the courts of a slaveholding State; for, in every
one of these cases, the party claiming freedom had not procured any
adjudication upon his right in the country where it accrued.

This very brief examination of the questions involved in this case,
will show the grounds upon which I hold it to be my duty to declare,
that the voluntary removal of a slave, by his master, to a State, territory
or country in which slavery is prohibited, with a view to a residence
there, entitles the slave to his freedom, and that that right may be as-
serted by action in our courts under our laws.

So far as it may be claimed in this case, that there is any thing pecu-
liar in the manner in which the slave was held in the free country, by
reason of his master being an officer of the United States army, it is
sufficient to answer, that this court, in Rachael vs. Walker, 4 Mo. Re-
ports 350, considered the effect of that circumstance, and decided that
such officers were not authorized, any more than private individuals, to
hold slaves, either in the north-west territory or in the territory west
of the Mississippi and north of thirty-six degrees thirty minutes, north
latitude. The act of Congress, called the Missouri Compromise, was,
in that case, held as operative as the ordinance of 1787.